**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

| | |
|---|---|
| PETER T.R.,<br>　　　Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>　　　Defendant. | Case No. 4:19-cv-04160-SLD-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Brief (Doc. 41), the Commissioner's Brief (Doc. 45), and the Plaintiff's Reply Brief (Doc. 46).  This matter has been referred for a Report and Recommendation.  For the reasons stated herein, the Court recommends the partially favorable decision of the Defendant, Kilolo Kijakazi, Acting Commissioner of Social Security, be affirmed and the Defendant's Partial Motion to Dismiss be granted.[1]

**I**

Peter T.R., who is statutorily blind and proceeding *pro se*, filed this case on August 14, 2019 against Andrew M. Saul, the Commissioner of Social Security.[2]  In his Complaint (Doc. 1), Peter alleged that the Administrative Law Judge (ALJ) Robert H. Schwartz, who issued an unfavorable decision on February 6, 2019, failed to discuss evidence, intentionally withheld and fabricated evidence material

---

[1] References to the pages within the Administrative Record will be identified by AR [page number].  The Administrative Record appears at (Doc. 39) on the docket.

[2] "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name . . . ." FED. R. CIV. P. 25(d).  Accordingly, Kilolo Kijakazi, Acting Commissioner of Social Security, has been substituted as the Defendant in this case.

to his Social Security Administration (SSA) review, and failed to adequately explain conflicts in the evidence, among other things. The crux of Peter's challenge was that the ALJ's determination that Peter received an overpayment from the SSA of $5,676.70 on his father's earning record was based upon erroneous findings of material facts and was an abuse of the ALJ's discretion. Peter further alleged that his mother, Margaret J.R., was harmed by the SSA's overpayment determination. Peter also claimed violations of the Freedom of Information Act (FOIA), Privacy Act, Administrative Procedures Act (APA), Fair Credit Reporting Act (FCRA), and his right to procedural due process under the Fifth Amendment, all stemming from the SSA's overpayment determination.

In lieu of an answer, the Commissioner filed a Motion for Remand (Doc. 17) to the Appeals Council pursuant to Sentence Six of 42 U.S.C. § 405(g) and a Partial Motion to Dismiss with Prejudice (Doc. 19) on March 27, 2020. The Partial Motion to Dismiss sought, for failure to state a claim, the dismissal of Peter's FCRA, FOIA, Privacy Act, procedural due process, and APA claims as well as his third-party claim regarding Social Security overpayments allegedly assessed on account of his mother. The Commissioner alternatively moved for summary judgment regarding those claims. Peter filed Oppositions (Docs. 23, 24) to both the Motion to Remand as well as the Partial Motion to Dismiss, and the Commissioner thereafter filed Replies (Docs. 28, 29) and Peter filed Sur-Replies (Docs. 30, 31).

On July 13, 2022, the Court entered an Order (Doc. 32) remanding this action for further proceedings, recognizing that Peter's additional claims were tied closely to his challenge of the overpayment determination, and thus staying this action pending the remand proceedings as further development "may well resolve or moot Peter's remaining claims." 7/13/22 Order (Doc. 32 at pg. 6). On July 20, 2023, the Acting Commissioner simultaneously filed the certified updated transcript (Doc. 39) in this case as well as a Status Report (Doc. 40) which provided

2

that:  after remand, the SSA took additional steps to develop the record and process this case, and on December 1, 2022, the Appeals Council issued a final, partially favorable decision; on February 17, 2023, Peter informed the Acting Commissioner's counsel that he wished to proceed with the litigation; and the Acting Commissioner requested the Court issue a scheduling order for briefing. The stay in this case was lifted on July 21, 2023.

Peter filed his Brief (Doc. 41) on July 30, 2023 and made the following arguments:  the ALJ's February 6, 2019 Unfavorable Decision "was error because he applied the wrong standard of proof, because he made numerous errors of law, and because his find [sic] was contrary to the evidence"; the ALJ "violated layman Peter [T.R.'s] rights under the United States Constitution by holding a non-adversarial hearing without availability of counsel"; the ALJ "violated [Peter's] constitutional rights when he failed to facilitate the subpoena of witnesses to provide material and relevant information"; the ALJ "committed reversible error by failing to ensure that Peter [T.R.] knowingly, voluntarily, and intelligently waived his right to present mitigating evidence beings [sic] he was without counsel"; the ALJ "failed to ensure that Peter [T.R.] received a fair hearing by permitting numerous procedural errors in violation of [Peter's] constitutional rights, including his right to due process and a fair hearing"; "Margaret [J.R.'s] $3,160.00 forfeiture is excessive and disproportionate to the overpayments imposed in similar hardship Social Security cases"; "Acting Privacy Officer Monica Chyn and ALJ Robert H. Schwartz abused their discretion by denying [Peter's] Privacy Act requests in clear prejudice to [Peter]"; and "post hoc justification:  no Monday Morning quarterbacking allowed."  Plf's Brief (Doc. 41-1 at pg. 1).  On August 1, 2023, the Court found as moot the Commissioner's Partial Motion to Dismiss, granted her leave to include the arguments made in her Partial

Motion to Dismiss in her brief, and granted Peter leave to include any response to those arguments in his reply brief.

The Acting Commissioner filed her Response to Plaintiff's Opening Brief (Doc. 45) (Acting Commissioner's Brief) on October 10, 2023 and, as the Court permitted, included arguments challenging Peter's additional claims. Peter filed his Reply Brief (Doc. 46) on October 22, 2023.

## II

42 U.S.C. § 405(g) provides in relevant part that, "Any individual, after any *final* decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain review of such decision by a civil action . . . ." (emphasis added). Here, the Appeals Council's December 1, 2022 is the SSA's final decision for purposes of judicial review under Section 405(g). *See* 20 C.F.R. § 404.981 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding . . . ."). The Court accordingly will not address any of Peter's arguments made in his opening Brief which specifically pertain to the ALJ's February 6, 2019 unfavorable decision.

## A

On October 13, 2022, the Appeals Council (AC) sent Peter a letter explaining that it considered the written record that was before ALJ Schwartz and the testimony at the hearing before the ALJ on April 19, 2018. AR 672. The AC further explained that it planned to make a decision finding Peter was overpaid $13,156.60 in benefits from January 2008 through August 2015, recovery for $909 of the overpayment was waived, and a returned check for $615 and remittances Peter made totaling $11,386[3] reduced the overpayment balance to $246.20. *Id*. The AC stated it also planned to find Margaret, Peter's mother, was underpaid $2,913.80

---

[3] $11,386 is a typo. The amount should be, as stated correctly in the AC's December 1, 2022 Decision, $11,386.40. Given the history of this case before the SSA, the precision seen lacking in the AC's October 13, 2022 letter is discouraging, to say the least.

in benefits. *Id*. The letter further explained why the AC was taking that action (which amounted to a summary of the sequence of events that transpired between August 1975 and October 2022 pertaining to Peter's child's benefits on his father's record and disability insurance benefits on his own record), that Peter was permitted to ask for a hearing before an ALJ in writing within 30 days from the date of the letter, and that Peter was permitted to send the AC a statement about the facts and the law in this case within 30 days of the date of the letter. AR 672-674. The Acting Commissioner notes that Peter did not submit any such statement as permitted by the AC's October 13, 2022 letter.[4]

In the AC's December 1, 2022 Decision, the Acting Commissioner's *final* decision, the AC explained it incorporated ALJ Schwartz's statement of the evidence in this case and his references to the provisions of the Social Security Act and the regulations of the SSA, as supplemented by the evaluation of evidence set forth therein. AR 3. The issue before the AC was whether Peter was overpaid benefits. *Id*. The AC then set forth the following. Peter became entitled to child's benefits on his father's record beginning August 1975 and subsequently became entitled to disability insurance benefits (DIB) on his own record beginning January 2008. AR 3-4. Peter was notified on March 28, 2010 that he was overpaid $909 in benefits through March 2010, but the SSA waived recovery of the overpayment on April 16, 2010. AR 4. A continuing disability review determination on April 4, 2015 found Peter completed a trial work period (TWP) in May 2005, his disability ceased due to substantial gainful work activity (SGA) in January 2014, and his

---

[4] In his Reply Brief, Peter argues that such a statement is a "resounding lie" because he "attempted to send a rebuttal . . . within the confines of the 10-day deadline imposed on December 12, 2022[.]" *See* Plf's Reply Brief (Doc. 46 at pg. 5). It is clear from his Reply Brief that Peter misunderstood the Acting Commissioner to be saying that Peter did not comply with the 10-day deadline set forth in the AC's December 1, 2022 Notice of Appeals Council Decision. *Compare* AR 674; *with* AR 1 ("If you disagree with this decision and want to continue the court action, you must tell us within 10 days"). Peter has presented nothing to indicate he actually sent a statement to the AC within 30 days of the *October 13, 2022* letter. In fact, while the December 1, 2022 letter gave Peter a 10-day deadline to inform the AC of whether he disagreed with its Decision and wanted to continue the court action, it appears the Acting Commissioner did not enforce that deadline. It was not until February 17, 2023 that Peter informed the Acting Commissioner's counsel that he wished to proceed with the litigation.

entitlement to benefits terminated in April 2014. AR 4. On May 4, 2015, Peter was notified he was overpaid $11,386.40 in benefits. AR 4. A May 9, 2015 revised decision found that Peter completed a TWP in May 2005, his disability ceased due to SGA in October 2013, and his entitlement to disability terminated in January 2014. AR 4. That same date, Peter was notified that he no longer qualified for childhood disability benefits beginning January 2014 because it was determined that he was able to work. AR 4. On May 12, 2015, Peter requested reconsideration, stating that he was paying back $6,479.10, the amount he believed he was overpaid. AR 4. SSA records showed a remittance of that amount was credited to Peter's record on May 21, 2015. AR 4. Peter refunded the remaining $4,907.30 of the overpayment on August 6, 2015, and that remittance was credited to his record on August 27, 2015. AR 4.

The overpayment determination was reviewed and the reconsideration determination on May 24, 2016 found Peter still owed $5,676.70, the amount he was overpaid on his father's record when he became entitled to DIB on his own record. AR 4. Peter filed a request for hearing on August 4, 2016, stating he disagreed with the alleged overpayment of $5,676.70. AR 4. The ALJ found Peter was overpaid that amount from January 2008 through September 2008 and that he was underpaid $1,688.50 in benefits based on information from the payment service center that, as of September 2018, Peter was underpaid $2,526.80 in benefits on his own record and overpaid $838.30 on his father's record after taking into account the $3,160 withheld from his mother's benefits to recover Peter's overpayment. AR 4. The ALJ relied upon payment worksheets prepared by the payment service center in making his findings, however, the AC explained, "but those worksheets do not take into consideration overpayment reduction amounts credited to the claimant's record and show periods where deductions for SMI [supplementary medical insurance] premiums were incorrectly calculated." AR

4.  The AC also explained that, "While the hearing decision noted correspondence from [the SSA] on November 27, 2017 stating [Peter] was underpaid $9,991.90 in benefits on his record and overpaid $2,240.20 on his father's record," the underpayment calculation did not take into account Medicare Part B premiums withheld as money paid to Peter.  AR 5.

The AC prepared a payment worksheet for the period January 2008 through August 2015 based on the amounts due and paid Peter on his own record and on his father's.  AR 5.  The worksheet showed that Peter was overpaid $13,156.60 in benefits during that period.  *Id*.  The AC found Peter was overpaid that amount from January 2008 through August 2015.  *Id*.  Peter returned his May 2015 check (for $615), refunded a total of $11,386.40 in May 2015 and August 2015, and the SSA waived recovery for $909 of the overpayment.  *Id*.  Peter's overpayment balance was therefore reduced to $246.20.  *Id*.  The SSA withheld $3,160 of Margaret J.R.'s benefits to recover Peter's overpayment.  *Id*.  After crediting $246.20 toward Peter's overpayment, the AC found Margaret was underpaid $2,913.80 in benefits.  *Id*.

The AC thereafter stated its findings as to the overpayment amount to Peter from January 2008 through August 2015, the amounts Peter returned and refunded and which were waived, the amount the SSA withheld of Margaret's benefits, and the amount Margaret was underpaid.  *Id*.  The AC's ultimate decision was that Peter was overpaid $13,156.60 from January 2008 through August 2015, his overpayment balance was $0.00, and his mother Margaret was underpaid $2,913.80 in benefits.  AR 6.

## B

The Court must affirm the AC's decision as long as the AC's findings are supported by substantial evidence and the AC applied the correct legal standards. *Pitts v. Sullivan*, 923 F.2d 561, 564 (7th Cir. 1991); *see also Schloesser v. Berryhill*, 870

F.3d 712, 717 (7th Cir. 2017) (explaining the court's review is limited to determining whether the "Appeals Council's decision is supported by substantial evidence on the record as a whole"). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schloesser*, 870 F.3d at 717. Where the AC has identified supporting evidence in the record and built a logical bridge from that evidence to its conclusions, the reviewing court must affirm. *Id.*

Here, the Acting Commissioner points to the evidence of record cited by the AC which she says amount to substantial evidence in support of the overpayment determination the AC made. Indeed, the evidence the AC cited reveals Peter became entitled to child's benefits on his father's record beginning in August 1975, and Peter was approved for DIB on his own earnings record in January 2008. AR 646-70. The evidence of record indicates that Peter started working at Goodwill Industries in August 2004, worked there through December 2013, and began working at The Chicago Lighthouse in October 2013. AR 110, 114-28, 148-85, 196-98, 213. The evidence reveals that Peter exhausted in May 2005 his TWP provided to him per 20 C.F.R. § 404.1592(a). *See* 20 C.F.R. § 404.1592(a) (defining TWP as "a period during which you may test your ability to work and still be considered disabled"); 20 C.F.R. § 404.1592(e) (stating a TWP begins the month in which the individual becomes entitled to, among other possibilities, child's benefits and ends, as relevant here, the "9th month (whether or not the months have been consecutive and whether or not the previous 8 months of services were prior to January 1992) in which you have performed services within a period of 60 consecutive months if that 9th month is after December 1991"). He was also provided the extended period of eligibility due him per 20 C.F.R. § 404.1592a, beginning in June 2005. AR 198, 213; 20 C.F.R. § 404.1592a(a) (stating the reentitlement period is an additional period after 9 months of trial work during

which the individual may continue to test his ability to work if he has a disabling impairment, but the SSA may decide his disability ceased because his work is SGA); *id*. at 404.1592a(b) (providing the reentitlement period begins with the first month following completion of 9 months of trial work and ends, as relevant here, the last day of the 36th month following the end of the individual's TWP).[5] Peter's disability ceased due to SGA in October 2013, but he continued to receive DIB from October 2013 through December 2013, the grace period provided him per 20 C.F.R. § 404.1592a(a)(3)(ii).  *See* 20 C.F.R. § 404.1592a(a)(3)(ii) ("If we find that your disability ceased because you performed substantial gainful activity in a month after your reentitlement period ended, you will be paid benefits for the month in which your disability ceased and the two succeeding months.  After those three months, your entitlement to a period of disability or to disability benefits terminates").  Because he was able to work at SGA as of October 2013 and continued to work at SGA thereafter, Peter was no longer entitled to receive child's benefits nor DIB as of January 2014.  However, the AC cited to evidence revealing that Peter continued to receive benefits from January 2014 until August 2015, and he was additionally overpaid child's benefits for a period of time after he became entitled to DIB on his own earnings record.  AR 646-70, 671.  Specifically, Peter was overpaid $742.20 in child's benefits from January 2008 through December 2008 and was overpaid $12,807.40 in DIB from January 2014 through August 2015.  AR 671.  The payment worksheet the AC had prepared thus showed a total overpayment between January 2008 and August 2015 of $13,549.60, but it also showed underpayment in 2009 and 2010 which totaled $393.  *Id*.  The AC correctly

---

[5] The Court notes that the extended period of eligibility lasts 36 *consecutive* months.  *See Charlene C. v. Saul*, No. 18 C 7326, 2020 WL 2767581, at *1 (N.D. Ill. May 28, 2020) (referring to the reentitlement period under Section 404.1592a(b) as a "consecutive 36-month" extended period of eligibility).  The exhibit the AC cited indicates the extended period of eligibility went from June 2005 to January 2014.  AR 198.  The Commissioner does not explain the irregularity and Peter does not take issue with it.  Thus, the Court concerns itself with this point no further.

calculated the final overpayment between January 2008 and August 2015 to be $13,156.60. *Id*.

The foregoing evidence upon which the AC relied amounts to substantial evidence. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (underscoring that "substantial evidence" is not a high threshold). In his Reply Brief, Peter asserts it was unbeknownst to him that his TWP ended in May 2005 and states the SSA was supposed to suspend any TWP for five consecutive years to ensure his success. While he cites exhibits throughout his opening and Reply Briefs, Peter does not clearly identify any document that was before the AC which undermines its evaluation of the evidence as to his TWP. In fact, the administrative record includes a form completed by Peter in which he stated that on August 15, 2004 he "took my ticket to work," listing his employer as Goodwill Industries of the Inland Northwest, and he indicated he stopped working at that same place on October 4, 2013 (having started there on August 30, 2004). AR 116-17. As for the consecutive five-year period he references, Section 404.1592(e)(2) explains that an individual's TWP ends the 9th month "in which [the individual has] performed services within a period of 60 consecutive months[.]" Nowhere does that provision speak of suspending the TWP. Ultimately, Peter's mistaken belief as to his TWP is insufficient to upset the AC's decision.

As for Peter's assertions that he received his last child's benefit payment of $352.40 on September 3, 2008 and received DIB after that until April 8, 2015 in the amount of $615, that amounts to a challenge to the AC-prepared payment worksheet, Full Master Beneficiary Record (FACT) query and Payment History Update System (PHUS) query. *See* Hearings, Appeals, and Litigation Manual (HALLEX) I-3-2-15 (providing "FACT" is the full Master Beneficiary Record); POMS RS 02803.045 (providing "PHUS" is the payment history update system). The same is true for his less than clear arguments pertaining to Medicare

payments.  Other arguments Peter makes challenge the FACT/PHUS queries cited by and relied upon by the AC.  In its letter notifying Peter of the decision it intended to make which explained the evidence relied upon (payment worksheet, FACT query, PHUS query) and the way the overpayment was calculated, the AC explicitly provided Peter the opportunity to ask for a hearing before an ALJ and to send the AC a statement about the facts and law in his case within 30 days.  Peter did neither and only now makes the aforementioned challenges to the documents generated to assist the AC in making its determination as to whether an overpayment occurred and for how much.

The Court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner).  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  In making the arguments he does as to the AC's compilation and evaluation of the record evidence and in identifying specific dates and amounts paid, Peter essentially asks this Court to step in and decide the facts anew.  The Court is particularly loathe to do so not only because of the authority restricting it from doing so and the fact Peter neither asked for a hearing before an ALJ nor sent a statement about the facts and law in the case, but also given the hyper-specific/technical way in which the SSA makes overpayment determinations (as clearly illustrated by the history of Peter's receipt of disability benefits, the documentation in the transcript here, and the procedural history of the case in this Court).  As for his challenge to the payment worksheet and FACT/PHUS queries as not being the reports "actually used to calculate overpayments," Peter cites no authority for that statement and POMS GN 02201.003 Determining a Title II Overpayment Amount says otherwise. POMS GN 02201.003(F) Documenting the Overpayment says the SSA may use the following, among other things, to assist in making an overpayment determination: paid vs. payable charts; Master Beneficiary Record; PHUS; and payment history

11

and worksheets. *See Wash. State Dep't of Soc. and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003) (stating that while the POMS – administrative interpretations – "are not products of formal rulemaking, they nevertheless warrant respect . . . .").

C

The Acting Commissioner requests that the Court enter judgment reversing the AC's decision and remanding Peter's claim pursuant to sentence four of 42 U.S.C. § 405(g). The Acting Commissioner does so as she "acknowledges it is appropriate to remand so the agency can address whether [Peter] is entitled to a waiver of his overpayment[.]" Dft's Brief (Doc. 45 at pg. 19).[6] However, as illustrated above, the Acting Commissioner has also argued that substantial evidence supports the AC's overpayment determination. The Acting Commissioner contends that the Court's ruling on the merits of Peter's challenge to the overpayment determination is sought for the sake of administrative and judicial economy – "it would benefit the parties to know if the Court disagrees so that the agency can address the issue on remand if necessary." *Id*. But the Acting Commissioner asks for conflicting things. A reviewing court "will *reverse* an administrative law judge's decision *only if it is the result of an error of law or it is not supported by substantial evidence*[.]" *Crowell v. Kijakazi*, 72 F.4th 810, 813 (7th Cir. 2023) (emphasis added). Here, the Acting Commissioner has successfully argued that the AC's decision *is* supported by substantial evidence. Because the Acting Commissioner has not provided any authority for the Court to do as she asks, *i.e.* both find its decision was supported by substantial evidence but nevertheless remand, the undersigned does not recommend reversal and remand. However,

---

[6] The Acting Commissioner first stated in her Brief that to the extent Peter contends remand is warranted to evaluate whether he is entitled to a waiver of his overpayment (citing Peter's requests for waiver of overpayment appearing in the record), the Acting Commissioner agrees.

with or without a remand, the Acting Commissioner can consider Peter's requests for waiver of overpayment, and no party has argued otherwise.

## III

Turning to Peter's additional claims, he continues to argue in his opening and Reply Briefs that the ALJ failed to obtain a proper waiver of counsel and that he is entitled to relief under the FCRA, Privacy Act, FOIA, and the Fifth Amendment's due process clause as well as on his mother's behalf. However, "he [has] retired the Administrative Procedure Act claim in the interest of judicial economy." Plf's Reply Brief (Doc. 46 at pg. 14). Also in his Reply Brief, Peter states, "For judicial economy, [Peter] did abandon direct FCRA relief under the grounds the 'claim is untimely' in accordance with [the] FCRA." (Doc. 46 at pg. 10). He had again complained in his *opening* Brief that the SSA "impulsively" posted the disputed $5,676.70 overpayment to the credit bureau Experian, and, as a result, Peter was denied credit from several entities. Plf's Brief (Doc. 41-1 at pgs. 19-21). In his Reply Brief, Peter argues the SSA's reporting of the overpayment to Experian still bares relevance; the evidence of harm he suffered as a result is evidence of damages. However, his concession that his FCRA claim is untimely signals the failure of that claim.[7] A court must consider damages only where there is a claim to which they attach. Peter is not entitled to relief under the FCRA where he no longer has a claim under the FCRA.

The Court will treat the Acting Commissioner's request to dismiss the additional claims as one for summary judgment, as necessary, under Federal Rule of Civil Procedure 12(d). *See* Dft's Partial MTD (Doc. 20 at pg. 15) (stating that

---

[7] In her Brief, the Acting Commissioner argues that Peter's FCRA claim is untimely where he learned of the $5,676.70 overpayment to a credit bureau no later than July 27, 2017, but did not file his Complaint alleging FCRA violations until August 15, 2019, more than two years after the date he discovered the alleged wrongdoing. *See* 15 U.S.C. § 1681p (providing that an action to enforce any liability created under the subchapter codifying the FCRA may be brought in any appropriate U.S. district court not later than the earlier of two years after the date of the discovery by the plaintiff of the violation that is the basis for such liability or five years after the date on which the violation that is the basis for such liability occurs).

"[i]n the alternative, if this Court finds that a partial motion to dismiss is not appropriate, then the Court should consider Defendant's motion as a motion for summary judgment"); 8/1/23 Text Order (granting the Acting Commissioner leave to include the arguments made in her partial motion to dismiss in her Social Security brief; *and* Dft's Brief (Doc. 45 at pg. 15 n.8) (incorporating by reference the arguments made in the Memorandum (Doc. 20) in Support of the Commissioner's Partial Motion to Dismiss (Doc. 19)).

In its consideration of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a court must accept all well-pleaded factual allegations in the plaintiff's complaint as true and must draw all reasonable inferences in the plaintiff's favor. *White v. Keely*, 814 F.3d 883, 887-88 (7th Cir. 2016). "To survive a motion to dismiss, a complaint need not contain detailed factual allegations, but it must provide more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id*. at 888 (internal quotations omitted).

Federal Rule of Civil Procedure 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." The Court finds it appropriate to treat the Acting Commissioner's request to dismiss several of Peter's additional claims as one for summary judgment. Peter was provided more than one opportunity to present all the material pertinent to the Acting Commissioner's request, and there has been a heft of documentation introduced into the record as to the overpayment determination to which the additional claims are closely tied.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). However, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 250.

## A

Peter argues that the ALJ at the April 2018 hearing failed to exercise his discretion to appoint Peter standby counsel, and the ALJ otherwise fell "woefully short of conducting a constitutionally adequate examination of [Peter's] waiver of counsel." Plf's Brief (Doc. 41-1 at pg. 17). In his Reply Brief, Peter concedes the ALJ obtained a proper waiver of counsel but under false pretenses. The Acting

Commissioner argues the ALJ obtained a valid waiver of counsel in light of Seventh Circuit authority.

The Seventh Circuit has held that, to ensure a valid waiver of the statutory right to counsel at a disability hearing, the ALJ must explain to the *pro se* claimant: 1) the manner in which an attorney can aid in the proceedings; 2) the possibility of free counsel or a contingency arrangement; and 3) the limitation on attorney fees to 25% of past due benefits and required court approval of the fees." *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994) (citing 42 U.S.C. § 406). Here, the record reveals that Peter received a letter dated September 7, 2016 which informed him of the details of "Your Right to Representation." AR 275. Attached to that letter and a January 25, 2018 letter, he was specifically informed of what a representative could do, how to choose a representative, and what a representative may charge the claimant. AR 278, 297. He was also provided a list of legal organizations. AR 281. Peter completed and signed a form acknowledging he received the January 25, 2018 Notice of Hearing letter. AR 516; *see Jozefyk v. Berryhill*, 923 F.3d 492, 496-97 (7th Cir. 2019) (claimant's contention that there was no evidence he received the "Your Right to Representation" pamphlets problematic where he signed a form confirming he received at least one right-to-counsel notice). At the April 19, 2018 hearing, Peter testified the ALJ was correct that he was not represented. AR 78. The ALJ explained Peter's right to be represented by an attorney or a non-attorney, how the representative could help him, that some legal service organizations offered free legal representation if the claimant qualified, and Peter was welcome to proceed that day without a representative. *Id*. Peter confirmed he understood his rights to representation and stated affirmatively that he would like to proceed without a representative. *Id*. at pgs. 78-79.

The foregoing evidence establishes the ALJ obtained a valid waiver of counsel. Though Peter now argues the ALJ never offered him the option of

16

postponement and so Peter feared if he had not proceeded then and there he would be inhibited from any further hearing on the matter, the evidence belies that assertion.  Even viewing the evidence of what was said at the hearing in the light most favorable to Peter, the ALJ very clearly indicated Peter did not need to proceed then and there and was invited to speak up if he wished *not* to do so – "And of course you are welcome to proceed today without a representative . . . And would you like to proceed without a representative?"  AR 78-79.  The Acting Commissioner is entitled to summary judgment on this claim.

B

Peter argues the SSA blatantly disregarded the 20-day reply limit codified in FOIA and the Privacy Act.  He says he issued, to no avail, the SSA FOIA and Privacy Act requests on seven dates[8] seeking accurate records, reports, ledgers, audits, reviews, documents, papers, recommendations, files, correspondences, and other material that may have proved the existence of the alleged $5,676.70 overpayment.  In response, the Acting Commissioner argues Peter is not entitled to relief under FOIA because the SSA treats an individual's request for his own records as one under the Privacy Act rather than under FOIA, Peter's FOIA and Privacy Act claims are moot because he has not shown there are any specific records the agency has not provided, he never previously requested such a broad array of documents as he has listed in this case, his sweeping request is vague, and his request could be construed as requiring disclosure of materials that are exempt from disclosure under FOIA.  "FOIA is a federal law authorizing access to information, and it provides for injunctive relief.  5 U.S.C. § 552.  The Privacy Act is a federal law that protects information, with limited access provisions, and it

---

[8] Peter did not provide exhibit numbers for all of his listed inquiries.

provides for money damages.  5 U.S.C. § 552a."  *Moon v. Rivas*, No. 15-cv-00890, 2015 WL 5585637, at *3 (S.D. Ill. Sept. 21, 2015).

First, the Court seriously doubts that Peter's FOIA claim is viable, given the cases cited by the Acting Commissioner which dismissed FOIA claims against the SSA where the requests were for an individual's own records and given the SSA's own regulations.  *Varad v. U.S. Dep't of the Treasury*, No. MC 18-91338, 2018 WL 3849861, at *1-2 (D. Mass. Aug. 13, 2018); *N'Jai v. Berryhill*, No. 18-1616, 2018 WL 6697677, at *2 (W.D. Pa. Dec. 20, 2018); *Melvin v. Soc. Sec. Admin.*, No. 5:09-CV-235, 2010 WL 1958604, at *10 (E.D.N.C. Mar. 24, 2010); 20 C.F.R. § 402.15(b) ("If you are an individual and request records, then to the extent you are requesting your own records in a system of records, we will handle your request under the Privacy Act . . . ."); *and* 20 C.F.R. § 402.20(a) ("We will not handle your request under the FOIA and the regulations in this part to the extent it asks for records that are currently available, either from SSA or from another part of the Federal Government, under a separate statute that provides specific activity for charging fees for those records. For example, we will not handle your request under the FOIA and the regulations in this part to the extent it asks for detailed earnings statements under the Social Security program").  In any event, for the reasons that follow, the Acting Commissioner is entitled to summary judgment regardless of whether Peter's claim is one considered under FOIA or the Privacy Act (or both).

Second, Peter's FOIA/Privacy Act claim is moot.  To the extent Peter seeks injunctive relief in the form of his receipt of the documents he requested on the seven prior dates, he has already been provided the documents he *specifically* identified.  In his February 18, 2019, March 20, 2019, and June 1, 2019 inquiries, Peter specifically requested Exhibits 40 and 41 that appeared in ALJ Schwartz's List of Exhibits, and he requested an audible DVD recording of his April 19, 2018 hearing.  Plf's Compl. Exh. (Doc. 1-3 at pgs. 7, 11, 17, 80-81).  The Acting

Commissioner has detailed the efforts the SSA took in January and February 2020 to respond to Peter's FOIA/Privacy Act requests.  The Declaration of Todd Muehling, Technical Expert at the Rock Island (Illinois) Field Office, SSA, provides that he searched the Master Beneficiary Record, PHUS, eView, Claims Folder User Interface (CFUI), Case Processing Management System (CPMS), and Debt Management System (DMS) for information under Peter's and his father's Social Security numbers, the information consisted of Retirement Survivors and Disability Insurance (RSDI) payment histories and data from SSA-1099 tax forms from 2008 to 2015 for Peter, and Mr. Muehling printed the information and gave it to Cristina Vital, District Manager for the Rock Island field office.  Dft's Partial MTD (Doc. 20-1 at pgs. 2-3).  Ms. Vital's Declaration indicates that Mr. Muehling provided her Retirement Survivors and Disability Insurance payment histories and data from SSA-1099 tax forms from 2008 to 2015, that she printed spreadsheets from the CFUI system listing payments made to Peter as well as amounts he should have been paid, and she mailed the spreadsheet printouts, the RSDI payment history, and the data from SSA-1099 forms to Peter by certified mail, and she received tracking which indicated the package was delivered.  *Id*. at pgs. 5-6.  Christianne Voegele's, Chief of Court Case Preparation and Review Branch 1 of the Office of Appellate Operations, SSA, Declaration provides that she sent Peter Exhibits 40 and 41 and a burned encrypted CD of the April 2018 hearing on February 20, 2020.  *Id*. at pgs. 9-10.

Peter persists in arguing he did not receive all the documents he requested (but does not explicitly contest his receipt in early 2020 of Exhibits 40 and 41 and the burned CD of the April 2018 hearing).  As the Acting Commissioner argued previously and now, Peter's alleged requests for accurate records, reports, ledgers, audits, reviews, documents, papers, recommendations, files, correspondences, and other material are vague, at best.  *See* 5 U.S.C. § 552(a)(3)(A) (providing

requests for records under FOIA must "reasonably describe[] such records").  At worst, it does not even appear from the face of his several FOIA/Privacy Act requests that he included such a succinct list where he included discussion of things beyond particular requests for particular documents.  *See, e.g.*, Plf's Compl. Exh. (Doc. 1-4 at pgs. 58-62) (asking the SSA in a June 18, 2016 FOIA request letter to "cease and desist" continuing "malicious harassment" in sending him fraudulent SSA billing statements, mentioning "clandestine algorithms" the SSA used, listing his living expenses, detailing his understanding of his TWP, and detailing how the overpayment depleted his savings); *id.* at pgs. 55-60) (stating much of the same to the SSA in an August 8, 2016 FOIA request letter).

Third, Peter does not make a cogent argument that he is entitled to money damages under the Privacy Act, and so the Court does not reach the issue.  *See* 5 U.S.C. § 552a(g)(4)(A) (stating a plaintiff is entitled to recover damages only if "a court determines that the agency acted in a manner which was intentional or willful"); *compare* Plf's Brief (Doc. 41-1 at pg. 27) (arguing "clear prejudice" and remedy for Privacy Act violation should be to vacate this case); *and* Plf's Reply Brief (Doc. 46 at pg. 11) (arguing money damages are available to the "prevailing party" under Fed. R. Civ. P. 54(d)).  Peter presents only arguments to rebut the evidence the Commissioner cites in support of her position that Peter's FOIA/Privacy Act claim is moot.  The Commissioner is entitled to summary judgment.

## C

Peter contends his Caucasian coworkers were all afforded a satisfactory detailed explanation as to the cause of their overpayments and the dates of occurrence from Social Security, and in so doing, attempts to state a Fifth Amendment equal protection claim.  But it is unclear what theory Peter pursues. He does not identify *any* provision of the Social Security Act in support of his

would-be Fifth Amendment equal protection claim.  *Compare Weinberger v. Wiesenfeld*, 420 U.S. 636, 653 (1975) (holding gender-based distinction mandated by provisions of the Social Security Act violated the right to equal protection secured by the Due Process Clause of the Fifth Amendment).  Nor does he plausibly allege discriminatory intent.  *See Scruggs v. Nielsen*, No. 18 CV 2109, 2019 WL 1382159, at *7 (N.D. Ill. Mar. 27, 2019); *see also Chi. Firefighters Local 2 v. City of Chi.*, 249 F.3d 649, 653 (7th Cir. 2001) ("[O]nly deliberate discrimination is actionable under the equal protection clause").  Instead, he makes conclusory statements that he is looked upon as a disfavored American Indian, overpayment determinations have not been applied uniformly, and he was not granted reasonable notice to a supplementary hearing (citing the POMS[9] and HALLEX[10]).  Peter fails to state a Fifth Amendment equal protection claim.[11]

Peter also claims that the SSA's reporting of his $5,676.70 overpayment to Experian in July 2017 violated his procedural due process rights because he did not have a hearing on the overpayment until April 19, 2018.  "A procedural due process claim requires the plaintiff to show that [he] was deprived of a liberty or property interest that warrants due process protection and that the deprivation occurred without constitutionally sufficient procedures."  *Arthur-Price v. Blinken*, No. 21 C 3475, 2022 WL 1004415, at *4 (N.D. Ill. Apr. 4, 2022) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  The Court can find no case to support a finding that the *reporting* of an overpayment can, in and of itself, be a deprivation of a liberty or property interest, particularly where the posting was removed about one

---

[9] See *supra* for the explanation that the POMS is not the product of formal rule-making.

[10] *Gebauer v. Saul*, 801 F. App'x 404, 408 n.1 (7th Cir. 2020) (unpublished opinion) (observing that the HALLEX's provisions "are not binding law independent of the governing statutes and regulations"); *see also Davenport v. Astrue*, 417 F. App'x 544, 548 (7th Cir. 2011) (unpublished opinion) (stating "no circuit has held that the HALLEX creates *constitutional* rights because, of course, only the Constitution, not an agency's rules of procedures, is the source of such rights") (emphasis in original).

[11] The Commissioner failed to acknowledge Peter's reference to a claim for the violation of his Fifth Amendment right to equal protection.

month after the SSA reported it.  *See* Plf's Compl. Exh. (Doc. 1-6 at pg. 97); *and id*. at pg. 101); *see also Mathews*, 424 U.S. at 322 (stating a recipient of Social Security disability benefits has a statutorily created property interest *in the continued receipt* of those benefits) (emphasis added).

Moreover, Peter ultimately received a hearing on his overpayment on April 19, 2018.  While it appears he takes issue with the time that passed between the report of the overpayment (in July 2017) and the hearing (in April 2018), the evidence before the Court does not establish the delay was arbitrary or the result of some inexcusable circumstance.  *Winger v. Barnhart*, 320 F. Supp. 2d 741, 747 (C.D. Ill. 2004) (explaining though administrative delay can violate due process, "[s]ince administrative efficiency is not a subject particularly suited to judicial evaluation, the courts should be reluctant to intervene in the administrative adjudication process, absent clear congressional guidelines or a threat to a constitutional interest") (quoting *Wright v. Califano*, 587 F.2d 345, 353-54 (7th Cir. 1978)); *see also McDonald v. Astrue*, 465 F. App'x 554, 556 (7th Cir. 2012) (unpublished opinion) (explaining there is no due process right to have one's disability benefits adjudicated in less than 270 days and pointing out that the Supreme Court rejected "the notion that federal courts can impose mandatory deadlines for processing Social Security claims").  The Acting Commissioner makes additional, convincing points:  Peter cannot identify any harm he incurred due to the delay where he was, at that time, not entitled to disability benefits, and the adverse information on his credit report had been removed long before the April 2018 hearing.

Lastly, the Court agrees with the Acting Commissioner that to the extent Peter alleges a separate procedural due process violation with respect to the $5,676.70 overpayment determination, Peter must channel his allegations (challenging the overpayment determination) through the judicial review process

contained in 42 U.S.C. § 405(g). Because this case was remanded pursuant to Sentence Six of 42 U.S.C. § 405(g), and the AC reviewed the record and rendered a partially favorable decision on December 1, 2022 which this Court has now reviewed, that ends the Court's inquiry into Peter's procedural due process contentions. As for Peter's argument that he did not receive from the SSA, in ALJ Schwartz's own words, "actual formal notice of overpayment," AR 71, the evidence contradicts any indication that Peter received *no* notice that the SSA determined he was overpaid. Peter attached to his very Complaint (Doc. 1) a letter he wrote in which he indicated that he "received a Social Security Administration Overpayment notice dated 18-May-2016" of $5,676.70. Plf's Compl. Exh. (Doc. 1-4 at pg. 34). As the Acting Commissioner argues and as Peter's letter reveals, that notice was sufficient to enable him to not only request an ALJ hearing concerning the overpayment, but also to present written argument concerning the overpayment to the ALJ. *See* Plf's Compl. Exh. (Doc. 1-4 at pg. 34) (Peter setting forth the details of his reimbursements to the Mid-Atlantic Program Service Center and otherwise setting forth his challenge to the overpayment determination); *id.* at pg. 78 (Peter's request for hearing in August 2016); *and id.* at pg. 89 (Peter's letter to the ALJ in February 2018). The Acting Commissioner is entitled to summary judgment on Peter's Fifth Amendment procedural due process claim.

## D

Finally, Peter argues, on behalf of his deceased mother Margaret, that an individual with the Richmond, California Social Security Western Program Service Center exerted undue influence over Margaret and did not advise her of her right to appeal. Further, Peter argues that Margaret incurred debt as a result of the unforeseen hardship caused by the SSA's use of her benefits to recover Peter's overpayment. The Acting Commissioner argues Peter has not shown he has standing to assert his mother's claims in federal court, he has not shown his mother

properly exhausted her administrative remedies as required for a suit to be permissible under 42 U.S.C. § 405(g), and Peter is not an attorney and is proceeding *pro se*.

To have standing, a plaintiff must have: 1) suffered an injury in fact, 2) that is fairly traceable to the challenged conduct of the defendant, and 3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The plaintiff bears the burden of establishing these three elements. *Id*. To establish an injury in fact, a plaintiff must show that he suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id*. at 338. An injury is particularized if it affects the plaintiff in a personal and individual way. *Id*.

Here, Peter's allegations all pertain to the alleged injury his mother has/had[12] incurred - he describes the effects the SSA's overpayment had on her.[13] The Supreme Court "has held that the plaintiff generally must assert *his own legal rights and interests*, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added). While there may be circumstances where it is necessary to grant a third party standing, the party seeking it must show: 1) the right "close" relationship with the person who possesses the right; and 2) whether there is a "hindrance" to the possessor's ability to protect her own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004). Here, Margaret is/was Peter's mother, so the first additional factor is seemingly satisfied. However, significantly, the Acting Commissioner notes it is possible that the SSA owes someone money on the earnings record of Peter's late father (who

---

[12] Peter indicated in his Reply Brief that his mother is no longer alive. *See* Plf's Reply Brief (Doc. 46 at pg. 15) (writing "if she was still alive").

[13] He also appears to conflate his position with that of his mother, as Peter argues his mother's "right" to waiver of the overpayment was violated.

could have been a source of widow's benefits for Peter's mother), and so Margaret and Peter could have *competing* claims to that money. As for the second additional factor, Peter has underscored his mother's age, the fact she did not have a driver's license, and that she could not visit the local Social Security office in person. The Court does not find advanced age or the lack of a driver's license the types of "hindrances" which would otherwise allow Peter's third party standing; at any given time in the federal court system, individuals who are elderly and individuals without driver's licenses directly, ably participate in cases as the plaintiffs to protect their *own* interests. Though Margaret has since died following this case's initiation, the Court notes that legal representatives routinely protect the interests of decedents' estates in federal court. Peter does not have standing, third party or otherwise, to assert a claim on behalf of his mother.

This outcome is especially warranted given that Peter is proceeding *pro se*. A *pro se* party cannot represent another party. 28 U.S.C. § 1654 ("In all cases of the United States the parties may plead *and conduct their own cases personally* or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein") (emphasis added); *Nocula v. UGS Corp.*, 520 F.3d 719, 725 (7th Cir. 2008) ("one *pro se* litigant cannot represent another"); *see also Hunter v. Pepsico, Inc.*, 631 F. App'x 445, 446 (7th Cir. 2015) (unpublished opinion) (explaining an estate's legal representative could not sue on behalf of the estate's many beneficiaries because he was *pro se*) (citing *Malone v. Nielson*, 474 F.3d 934, 937 (7th Cir. 2007)).

## IV

Between his Complaint and opening Brief, Peter requests damages and other legal and equitable relief as well as costs of suit (including attorney's fees). As for Peter's request for money damages, even assuming he succeeded on his claims in this case, particularly his constitutional claims, "The [Social Security] Act

. . . makes no provision for remedies in money damages against officials responsible for unconstitutional conduct that leads to the wrongful denial of benefits." *Schweiker v. Chilicky*, 487 U.S. 412, 424 (1988).  As for Peter's request that the SSA be enjoined from harassing him any further, injunctive relief falls outside the scope of what this Court can award under Section 405(g).  *See Walker v. Colvin*, No. 5:13-cv-01762, 2013 WL 5737701, at *3 (N.D. Cal. Oct. 21, 2013) ("The limited waiver of sovereign immunity designated by the Act means that the court lacks subject matter jurisdiction over any of Plaintiff's claims or requests for relief premised on something other than judicial review of the ALJ's decision as provided by 42 U.S.C. § 405(g)").

As for Peter's request for costs of this suit, the Equal Access to Justice Act (EAJA) permits an award of costs as enumerated in 28 U.S.C. § 1920 to the "prevailing party" in a civil action brought against a United States agency.  28 U.S.C. § 2412(a)(1).  It is premature for the Court to consider whether Peter is a "prevailing party" entitled to costs where he has not timely filed an EAJA petition. *See* 28 U.S.C. § 2412(d)(1)(B) ("A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought . . . ."); *see also Thomas for Brown v. Sullivan*, 785 F. Supp. 788, 791 (C.D. Ill. 1992) ("A plaintiff in a social security appeal who has secured either type of remand (that is, a sentence four or a sentence six remand) from the district court is entitled to EAJA fees"); *but compare Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 842 (6th Cir. 2006) ("Although a sentence six remand, by itself, is not a sufficient basis for a litigant to claim 'prevailing party' status . . . the result of subsequent administrative proceedings is sufficient to confer prevailing party status upon that same litigant") (internal citations omitted).

As for Peter's request for attorney fees, it is premature like his request for costs is. Regardless, a *pro se* plaintiff who is not a lawyer cannot recover fees under 28 U.S.C. § 2412. *Krecioch v. U.S.*, 316 F.3d 684, 688 (7th Cir. 2003) (explaining that a claimant who appears *pro se* "defeats the very purposes underlying the fee-shifting provisions of [the EAJA]," and "join[ing] the other circuits in holding that attorney's fees are not available for *pro se* litigants under the EAJA").

## V

For the reasons set forth above, it is recommended that: 1) the Acting Commissioner's December 1, 2022 partially favorable decision be affirmed; 2) the Defendant's Partial Motion to Dismiss previously filed on March 27, 2020 and incorporated into its responsive Brief, be granted; 3) the Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Kilolo Kijakazi, Acting Commissioner of Social Security, finding the Plaintiff, Peter T.R., was overpaid $13,156.60 in benefits from January 2008 through August 2015, finding his overpayment balance is $0.00, and finding Margaret R. is underpaid $2,913.80 in benefits is AFFIRMED. The Plaintiff's remaining claims are all dismissed."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on December 11, 2023.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE